1
2
3
4
5

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE TYLER, | Case No. 1:12-cv-01129-SKO  HC |
| Petitioner, | |
| v. | ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS |
| RON BARNES, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.[1]  Petitioner contends that (1) his Sixth Amendment rights were

violated when the prosecutor excused two jurors for improper reasons and the trial court denied his

*Wheeler/Batson* motion; (2) the trial court denied Petitioner due process when it denied his motion to

suppress and made no findings of fact; and (3) ineffective assistance of counsel violated his Sixth

Amendment rights when (a) trial counsel failed to move for dismissal since retrial was barred; (b)

when trial counsel failed to present exculpatory evidence; (c) trial counsel failed to investigate

prosecution witnesses; (d) trial counsel failed to present witnesses to show the perjury of the

prosecution witnesses; (e) trial counsel failed to move to dismiss charges for insufficient evidence;

and (f) appellate counsel failed to present issues regarding trial counsel's ineffective assistance.

///

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented, in writing, to the jurisdiction of a United States Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.

I.     **Procedural Background**

In an information dated March 23, 2007, the Kern County District Attorney charged Petitioner with second degree murder (Cal. Penal Code § 187(a)(1)) and assault of a child under the age of eight (Cal. Penal Code § 273ab(2)).[2]

Petitioner's first trial began on December 15, 2008.  It ended December 18, 2008, when the trial court granted Petitioner's motion for a mistrial to permit further analysis of certain evidence.

Petitioner's second trial began July 20, 2009.  On July 31, 2009, the jury found Petitioner guilty of both counts. The trial court sentenced Petitioner to a prison term of 25 years to life on count 2, and 15 years to life on count 1 (stayed pursuant to (Cal. Penal Code § 654)).

On October 27, 2010, the California Court of Appeal, Fifth Appellate District, vacated Petitioner's sentence and remanded for correction of the abstract of judgment to reflect the time served and sentences orally pronounced by the judge at the sentencing hearing.  *People v. Tyler*, No. F058478 at *23 (Cal.Ct.App. October 27, 2010) (Lodged Doc. No. 8).  In all other regards, the state appellate court affirmed the judgment against Petitioner.  *Id.*  The California Supreme Court denied review on January 12, 2011.

Petitioner filed a petition for writ of habeas corpus in Kern County Superior Court on December 28, 2011.  On February 15, 2012, the Superior Court denied the petition.  The Court of Appeal denied the petition on June 19, 2012; the California Supreme Court denied the petition on September 26, 2012.

On July 11, 2012, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court.

///

///

---

[2] Petitioner's mother, Mavis Watson, was charged with being an accessory (California Penal Code § 32).  Watson was tried with Petitioner and convicted.  Petitioner's cohabitant, Dionna Williams, aka Dionna Wheat, pleaded guilty to related charges.  She was granted Fifth Amendment immunity and testified against Petitioner.

## II.   **Factual Background**

The Court of Appeal found the following facts:

In August 2006, [Petitioner] had been living with his girlfriend, Dionna [Williams, also known as Dionna Wheat], in her house in Rosamond for about two years.  They lived with four children—their [eight-month-old] baby[, Alaia,] and Dionna's three other children, five-year-old Darion [Wheat], four-year-old Khaloni [Wheat], and three-year-old Kenneth [Pierce].  Petitioner's mother, [Mavis] Watson, lived about 30 minutes away.

[Petitioner] was prohibited by a court order from being in the same home as the children, but Dionna knowingly violated the order.  She lied to the social workers and told them that [Petitioner] did not live with her and the children, and she told the children to lie also.  She had witnessed [Petitioner] hit the children, but she had not reported it to the authorities.

On the evening of August 10, 2006, [Petitioner's] friends, Terrance and Derrick, came over to the house to play dominoes and drink beer.  While the three men were playing, five-year-old Darion came into the room and talked to [Petitioner] about tying his shoes.  [Petitioner] asked Darion who had taught him how to tie his shoes, and Darion responded that his mother had taught him.  [Petitioner] grabbed Darion by his shirt, pulled him close, and asked him the same question two more times.  [Petitioner] did not like Darion's answer, so he slapped him.  Dionna was standing nearby.  Terrance told [Petitioner] to leave Darion alone because he didn't really understand what [Petitioner] was talking about.  Terrance and Derrick tried to tell [Petitioner] how to explain things to children.  [Petitioner] pushed Darion away, and both Darion and Dionna left the room.

About 20 minutes later, Dionna left the house, leaving all the children alone with the three men.  A short time later, Terrance and Derrick left as well.

Dionna went to pick up her [seventeen-year-old] cousin, Kenna [Young], who was going to help care for the children over the weekend.  When they stopped at Dionna's father's house, Dionna and [Petitioner] spoke on the telephone.  [Petitioner] told her to "hurry up and get [her] ass back here" because Darion had said "Fuck you" to him and he was "so sick of all this shit."  Dionna hung up and told Kenna they had to go.  She said, "Oh, my God, he's about to beat my [. . . .]"

Four-year-old Khaloni was in the boys' room, which was next to the master bedroom because [Petitioner] told her to get into Darion's bed.  From there, she could hear from the master bedroom Darion screaming, "Mommy," and [Petitioner] asking him, "Who taught you how to tie your shoes?"  Khaloni also heard "[w]hooping sounds, like slapping sounds: and a whipping sound from a weight lifting belt.

About 20 minutes after Dionna called [Petitioner], she and Kenna arrived back at the house.  Dionna knocked on the door because she did not have her

3

house keys.  [Petitioner] asked, "Who is it?" and opened the door when Dionna replied.

[Petitioner] stood at the door in wet, blue boxer shorts.  He was holding Darion over his shoulder with his left arm.  Darion was naked, limp, and motionless.  His eyes were rolled back in his head and blood was coming out of his mouth.  His bottom teeth had been knocked out and he was covered in bruises. Dionna thought he was dead and she started screaming, "My baby."[3]

[Petitioner] grabbed Dionna and took her into the master bedroom.  The shower was running in the master bathroom and the floor was wet.  The other children were in the boys' room and the baby was screaming on the bed in the master bedroom.  [Petitioner] told Dionna that he "whooped" Darion with his weight lifting belt because Darion would not stay still.  [Petitioner] pointed to the bloody weight lifting belt on the bedroom floor.  The belt was four or five inches wide and had a big buckle.  [Petitioner's] clothes and bloody shoes were also on the bedroom floor.  [Petitioner] repeatedly told Dionna that he did not mean to do it and he was going to kill himself.

Darion jerked and Dionna realized he was not dead.  She grabbed him and patted his arms.  She ran to the front of the house and picked up the telephone to call the police, but [Petitioner] came up behind her, stood with his body against hers, and asked what she was doing.  Dionna was afraid [Petitioner] was going to beat her, as he had done more than 100 times in the past.  Dionna explained that she was just going to call Watson.  Dionna pleaded with [Petitioner] to let her call Watson because they needed some help.  Dionna called Watson and screamed that [Petitioner] had killed Darion and she needed Watson to come help her. [Petitioner] screamed that he did not kill Darion.  When Dionna said that Darion was going to die, Watson said she was on her way.

Kenna repeatedly told [Petitioner] and Dionna that they needed to take Darion to the hospital, but [Petitioner] said he would go to jail and Dionna said her children would be taken away.  Dionna said Darion was going to be okay.

Dionna and Kenna put all the children in the car to go get help. [Petitioner] came out and told Dionna to get in the car.  Kenna thought they were going to the hospital, but, to her surprise, [Petitioner] turned the opposite direction and drove them to Watson's house.  Dionna was talking to someone on a cell phone, saying, "He done killed my baby."  On the way, they met Watson's car and both cars pulled over.  Watson moved Dionna and Darion to her car.  Watson asked [Petitioner], "Boy, what have you done?"  Watson told Kenna, "You ain't seen nothing, and you don't know nothing."  Kenna took the statement as a threat. Watson then drove Dionna and Darion to Watson's house.

[Petitioner] drove Kenna and the remaining children to the house of his sister, Tiffinay.  On the way, he explained to Kenna that he "didn't mean to do it[.]"  He said, "[T]he reason why I kept whooping [Darion] is because [I] told

---

[3] In the front bathroom, there was water in the bathtub and Darion's teeth were on the counter.

him to stand up, and he wouldn't stand up."  [Petitioner] said he was going to kill himself and he needed to get his gun.  After [Petitioner] picked up Tiffinay and her boyfriend, he started to tell them what happened, but the boyfriend told [Petitioner] to wait until Kenna got out of the car.  [Petitioner] drove to Watson's house.

At Watson's house, Watson took Dionna and Darion to her bedroom. Darion lay on the bed unconscious.  He was black and blue and he had several knots on his head.  His mouth was swollen and would not shut.  Tiffinay's boyfriend put ice on Darion's head.  Darion's breathing had slowed and Dionna told Watson they needed to go to the hospital, but Watson just screamed at her and called her a stupid bitch.  Watson took all the telephones in the house, including Kenna's cell phone and said, "[A]in't nobody using [my] goddam phones."  Kenna, who was in another room with the children, could hear Darion's labored breathing.  She could hear Dionna crying and Watson telling her to shut up.

That night, Darion slept with Watson on Watson's bed.  Dionna watched Darion through the night.  The next morning, Dionna saw him stop breathing. She said to Tiffinay, "You['ve] got to save my baby.  He's dead."  Watson told Tiffinay to take Donna and Darion to the local clinic because "there wasn't no fucking ambulance coming out to her house."  Dionna believed Watson sent Tiffinay with her to watch her.

After they left, Watson entered the room where Kenna was with the children and told Kenna, "You better not say nothing," and "You don't know nothing."  Watson repeated this throughout the day.  When they were in the kitchen, Watson made these statements to Kenna while standing next to a gun that was on the counter.  Kenna perceived the presence of the gun as a threat.  Kenna knew that Watson and her family were very violent people who were involved with drugs and had used guns in a violent way in the past.  Kenna though they might kill her when the whole thing was over.  At some point, Watson took the baby, then put Kenna, Khaloni, and Kenneth in another bedroom that had a deadbolt and locked the door for a few hours.[4]

From the clinic, Darion was air-lifted to a children's hospital in Hollywood, where he remained on life support for hours until he died.  At both the clinic and the hospital, Dionna claimed that Darion was injured when she ran over him with a car, but the medical personnel did not think the injuries were consistent with her explanation.  Dionna did not tell the truth because the rest of her children were still at Watson's house and she knew there was a gun in the house.  Dionna felt her children were being held hostage and she was afraid Watson or [Petitioner] would kill them.[5]

Meanwhile, Watson took Kenna, Khaloni, and Kenneth to Dionna's house. On the way, Watson stopped in Saddleback and conducted a drug deal.  At

---

[4] Kenna testified that at some time during the day, she showered the children and noticed bruises on Kenneth and Khaloni.
[5] Dionna said she gave a truthful version of the events to law enforcement during the investigation.

Dionna's house, Watson parked on the street, got out, and told the rest to stay in the car. But after about five minutes, Kenneth told Kenna he had to use the bathroom, so she took him into the house. Kenna saw Watson cleaning the front bathroom where Darion's teeth were on the counter. She was cleaning the bathtub and wiping off the counter. She told Kenneth to use the toilet, then told them to get out and get back in the car. Ten or fifteen minutes later, Watson came out of the house carrying the weightlifting belt, the shoes and boxer shorts [Petitioner] had been wearing the previous night, the clothes Darion had been wearing the previous night, and a bag of papers. As they drove back to Watson's house, Watson gradually threw these items out of the car into the desert. When they got to Watson's house, Watson told Kenna to sit there and again warned her not to say anything. Because Watson had taken all the telephones, Kenna could not call anyone.

After about one and one-half hours, a social worker knocked on the door and stated she was taking the children into protective custody. Watson gave her Khaloni and Kenneth, but told her the baby was not there. The social worker returned five minutes later with a police officer and demanded the baby. Watson left the house and returned with the baby. When the police were present, Kenna asked Watson if she could leave, and she let her go.[6]

Blood was later found on the cabinets and in the shower of the master bathroom and on the wall and door between the master bathroom and master bedroom. The doors to the master bedroom and the front bathroom were damaged, the wall near the door to Darion's room was dented, and the wall in the den had two holes in it. According to Dionna, the blood and damage were not present before the night that [Petitioner] beat Darion.

An autopsy revealed Darion's extensive injuries.[7] He had contusions, abrasions, and bruises all over his head and face. He had multiple linear bruises extending down the side of his face, caused by a linear object, such as a belt, and he had abrasions on his chest and back. He suffered internal bleeding in his head, brain, chest, back, colon, arms, and legs. His injuries were not consistent with having been run over by a vehicle. His painful death—ruled a homicide—was caused by complications, such as brain swelling and organ failure, resulting from blunt force trauma.

Law enforcement arranged a recorded telephone conversation between Dionna and [Petitioner.] In it, [Petitioner] stated that he did not know if he should kill himself. He asked Dionna, "[I]s there a way you can tell ['em] you know something else?" He suggested that she should say her cousin Deshon did it. [Petitioner] referred to Darion's death as an accident.

In an August 31, 2006 interview with law enforcement, Watson claimed that Dionna had been smoking marijuana and may have been driving under the influence when she hit Darion with her car. Watson claimed that Darion seemed

---

[6] Kenna testified that Watson falsely set herself out as a day care provider. "She had something posted as a day care, but she didn't really take care of kids. It was like a fake day care."

[7] The evidence was presented through the pathologist's testimony and photographs of the autopsy.

normal when Dionna brought him to Watson's house, but Darion told her that night that he had been hit by a car. Watson, who ran a day care business, said she would be able to recognize a hurt child, and she did not notice any bruises on Darion. She said she went to Dionna's house that day to get clothes and food for the children. She had not seen [Petitioner] since they had all gone to Bakersfield before Darion's death.

### [Petitioner]'s Defense

The social worker who came to Watson's house to pick up the children did not see a weapon in the house. Kenna did not say anything to her other than that her aunt was a social worker.

An officer testified that he spoke to Dionna on August 10, 2006, to investigate a mark found on Kenneth's body in June 2006. Dionna took responsibility for the mark, explaining that she had spanked Kenneth. She assured the officer that [Petitioner] was not living in the home. The following day, the officer heard what had happened to Darion. He sent officers to the hospital, but Dionna left when they arrived.

When the officer spoke to Khaloni on August 11, 2006, she said [Petitioner] had never struck her, but Dionna had whipped her the previous day. She appeared to mean she had spanked her with a belt. She said [Petitioner] had not whipped Darion until this occasion, and had done so because he would not lie down and take a nap. She did not mention tying shoes.

On cross-examination, the officer testified that Kenna told him Watson and her family had a very violent history and she was afraid of them. Watson was involved in drug sales, buying and selling stolen guns, check fraud, and welfare fraud. Kenna tried to distance herself from the family, and she felt threatened and intimidated as a witness.[8]

The officer interviewed Dionna on August 12, 2006. She told him that she called [Petitioner] when she was out on August 10, 2006, because she was afraid he would be mad that she had been gone too long. He told her that he had to whip Darion because he said, "Fuck you," but she did not believe it because Darion was afraid of [Petitioner] and Darion would never say that.

Khaloni told the deputy that [Petitioner] was mean because he whipped people with a belt and he had whipped and killed Darion. She said [Petitioner] also whipped Kenneth the same night, and the deputy found bruises on Kenneth.

At the hospital, Dionna told officers that she ran over Darion with her car two times as she was backing up to her house.

When Watson's husband, Curtis, went to pick up Tiffinay from the hospital, Dionna came running after her and got into the car, too. Curtis asked

---

[8] After Darion's death, Kenna moved out of state. The prosecution transported her to California to testify at trial.

Dionna, "You're not going to stay at the hospital?" and she said she did not want to stay there with those people.  Curtis thought she was referring to Darion's father's relatives.  Curtis did not see Tiffinay make any threats to Dionna.

Dionna later told an officer that she fled the hospital because she got scared when she saw officers examining her vehicle.  She was afraid the officers would arrest her.

A Los Angeles officer testified that in February 2004, he was pursuing a suspicious vehicle that refused to stop.  The vehicle pulled over, Dionna got out, and the vehicle continued to evade the police.  The vehicle stopped in an apartment complex and the driver (Kenneth's father) ran, but was eventually apprehended.  Darion, Khaloni, and Kenneth were left inside the vehicle.

Watson's sister-in-law, Chyrel, testified that she had seen Dionna write a bad check and then run out of the grocery store when she was discovered.  Chyrel witnessed Dionna strike Khaloni with a belt, throw a shoe at her, and call her a bitch.  Chyrel's father also witnessed Dionna discipline her children inappropriately.  Dionna admitted to Chyrel that she had run over Darion with the car and that [Petitioner] was not involved, but Chyrel never reported this to the police.

[Petitioner]'s ex-girlfriend, Latisha, testified that she and [Petitioner] lived together from 2002 to 2005.  She had three young children of her own and they had a child together.  [Petitioner] was a good father to all the children and the children loved him.  He did not discipline the children; that was Latisha's job.

Latisha's daughter, Tiaunee, testified that [Petitioner] was good to her and her brothers.  He never spanked them.

Latisha's sister, Ariell, testified that Latisha and [Petitioner] had a happy relationship.  They lived together and Ariell sometimes stayed with them.  Latisha and [Petitioner] had a child together and Latisha also had her own children.  Ariell observed that [Petitioner] took care of them well and responsibly.  She never saw him discipline a child.  She said he was not the type of person who would beat a child.

Kenna's high school teacher believed Kenna was dishonest and would lie to protect her friends.  She was loud, obnoxious, and disruptive to the educational process.  She had received numerous referrals for bad behavior at school.

### Watson's Defense

Watson presented photographs to be admitted, but did not otherwise present a defense.

///

8

***Rebuttal***

Officers recovered a pair of extra-large blue gym shorts from the desert along the highway.

*People v. Tyler*, No. F058478 at *2-*11.

## III.   <u>Standard of Review</u>

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.*  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court

contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

The AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102. "A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## IV.    *Wheeler-Batson*[9] **Motion**

In his first ground for habeas relief, Petitioner contends that his Sixth Amendment rights were violated when the trial court denied his *Wheeler/Batson* motion following the prosecutor's challenging two jurors, one African-American and one disabled, for improper reasons. Respondent replies that the state court appropriately determined that the prosecutor did not challenge the two jurors for impermissible reasons. The Court agrees.

### A.    **Proceedings in Trial Court**

The California Court of Appeal summarized the facts as follows:

> During voir dire, the trial court called Ms. P. The court inquired, "[D]o you transfer from that chair, or do you have to stay in the chair?" Ms. P. answered, "I can do either, but I need assistance." When the court was asking the prospective jurors their occupations, Ms. P. stated she was a full-time college

---

[9] *Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal.3d 258 (1978), overruled by *Johnson v. California*, 545 U.S. 162, 173 (2005).

student in child psychology.  She lived with her mother on the east side of town, and she had no children.  Her mother was self-employed, taking care of aquariums.  Ms. P. was not excused in the first round of challenges, but after the next set of questions, the prosecution exercised a peremptory challenge to excuse her.

Later, Mr. W. was called from the venire.  In response to the court's questions, Mr. W. stated, "I'm a head operator for a major oil company in the sales department."  He said he had no children and he lived on the southwest side of town.  In response to [Petitioner's] counsel's question about being objective in a highly emotional case, Mr. W. stated, "You listen to all the evidence and make a decision after that."  Counsel asked, "You haven't heard anything that makes you think [you] couldn't be fair in this kind of case?"  Mr. W. responded, "No."  The prosecutor also posed a question to Mr. W.: "Mr. [W.], do you have any prior military experience?"  Mr. W. answered, "No."  The prosecution exercised a peremptory challenge to excuse Mr. W.

At this point, [Petitioner's] counsel raised a *Batson/Wheeler* motion, arguing that the prosecution has systematically excluded, "Whites [*sic*] and females and a disabled person."

Regarding Ms. P., [Petitioner's] counsel stated:

"And then we had juror 1, Ms. [P.], who I don't know if the record reflects, she's in a wheelchair, and I don't want to describe her medically, but it appears she has some kind of impairment that prevents her from walking and having complete body control, has a little bit of a tremor, just to my observation."

The court responded:

"I'm not certain that somebody suffering from what I observed was some type of probable cerebral palsy is a cognizable group, but that notwithstanding, merely pointing out that those types of people have been excluded is not sufficient to raise a reasonable inference in my mind that any act of discrimination has occurred as a result of the peremptory challenges; and I [find], therefore, that the prima facie showing was not made."

The prosecutor explained:

"And [Mr. S.] didn't have a leg.  He had to walk with the use of crutches, and so if we are looking in terms of disabilities, that's who the Defendant kicked when they were kicking at that point all Whites and one person who I guess would be labeled as disabled. So that's the reason I found it to be somewhat disingenuous in bring the *Wheeler* motion at that point.

11

The court then turned to the subject of Mr. W. and asked [Petitioner's] counsel to state his motion.  [Petitioner's] counsel explained that although Mr. W. was the only African-American excused by the prosecutor, there were very few African-American prospective jurors left and Mr. W. seemed like an average person who would be appealing to the prosecution.

The prosecutor explained that he had left an African-American in the jury box, and he believed three more African-Americans were in the venire.

The court considered various factors, then found no prima facie showing of discrimination.  When the court invited the prosecutor to put his reasons on the record, the prosecutor stated:

> "Mr. [W.] was part of the venire, . . . and he was part of about six people that were seated there . . ., and it was striking to me when he walked by me to sit down there . . . that he wore camouflage pants and a brown T-shirt, which to me, in my opinion, is completely inappropriate for coming to court and even as a juror.

> Also, during the time that he was seated over there, at one point as I was glancing about, I noticed that he had kept his sunglasses on, which is also inappropriate.  The dress is inappropriate period. The sunglasses may have just been an oversight, that he hadn't realized that he still had them on, or perhaps he's sensitive to light and only removed them when he came up as part of the group as respect during questioning.  That also explains the reason that I asked him the question . . . when I was given the opportunity to question the prospective juror about whether he had any military service, because he appeared to be of an age that he could have even retired from the military and taken on a second job working for an oil company.  So I was trying to give him the benefit of the doubt that perhaps he was more comfortable in military clothing and for him that's what he normally wore on his days off, but his answer was that he had  . . . no prior military service, and so I thought that his wearing those clothes . . .  was completely inappropriate for court and, to me, reflected someone who did not have respect for the Court or [take] seriously the responsibilities in coming here dressed in that way."

*In re Tyler*, No. F064669 at *13-15.

**B.    Governing Principles**

Acknowledging *Batson* and *Wheeler*'s basis under the Fourteenth Amendment to the United States Constitution, the state court applied California law to analyze Petitioner's *Batson/Wheeler* challenge:

12

The governing principles are well settled.  Under *Wheeler, supra*, 22 Cal.3d 258 . . . , [a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds— violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution.  Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment.

*Batson* states the procedure and standard trial courts should use when handling motions challenging peremptory strikes.  First, the defendant must make out a prima facie case by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*People v. Taylor*, 48 Cal.4[th] 574, 611 (2010) (internal citations and quotation marks omitted).

The Court of Appeals concluded that the defense never established a prima facie case of discrimination against either Ms. P or Mr. W.  With regard to Ms. P, the appellate court declined to reach the question of whether disabled people constitute a cognizable group in a *Batson/Wheeler* analysis.  Simply pointing out that the prosecution struck a single member of an identifiable group does not create a prima facie case of discrimination against members of that group.  Petitioner did not argue that the prosecution had used a disproportionate number of challenges against disabled members of the jury venire or that Petitioner himself was disabled.  In fact, as the prosecution pointed out, Petitioner himself had excused a disabled prospective juror.  The Court of Appeals found no evidence suggested a discriminatory motive in the prosecutor's striking Ms. P.

In a *Batson/Wheeler* motion, "the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." *People v. Avila*, 38 Cal.4[th] 491, 549 (2006).  In the three-step constitutional analysis of peremptory challenges, the first step is for the defendant to make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Because a

ruling on a *Batson/Wheeler* motion necessarily implicates a court's own observations, the reviewing court must give considerable deference to the trial court's findings and, if the record suggests grounds on which the prosecutor might reasonably have challenged the prospective juror at issue, its duty is to affirm.  *Id.*  Since the trial court found no evidence of discriminatory purpose in the prosecution's peremptory challenge of Ms. P., a reviewing court must consider the entire voir dire record to identify supporting evidence.  *People v. Howard*, 1 Cal.4th 1132, 1155 (1992).  The Court of Appeals did so, finding no evidence that Ms. P. was challenged because of group bias. Its determination reasonably applied federal constitutional law, and nothing further is required.

    In contrast, as an African-American, Mr. W. belonged to a cognizable racial group.  The Court of Appeals agreed with the trial court that Petitioner failed to make a prima facie showing of discrimination.  Another African-American prospective juror remained in the jury box and others remained in the venire: the prosecution challenged no other prospective African-American juror.  In any event, explaining that he based the challenge on Mr. W.'s inappropriately casual dress and wearing of sunglasses indoors, the prosecution offered a valid, nondiscriminatory reason for challenging Mr. W.

    Although some hairstyles may be associated with a particular race or ethnic group, juror characteristics such as grooming or hairstyles are frequently race neutral.  For example, the Supreme Court held that exclusion of a black juror for long, unkempt hair, a moustache, and beard was not pretextual since beards are not a characteristic peculiar to any specific race.  *Purkett v. Elem*, 514 U.S. 765, 769 (1995).   In an unpublished opinion, a Ninth Circuit panel held that a peremptory challenge was not pretextual where a prosecutor dismissed a prospective juror wearing an T-shirt, overalls, and an earring.  *United States v. Samayoa*, 27 Fed.Appx. 833, 834-35 (9th Cir. 2001).  *See also Vasquez v. Myers*, 8 F.3d 33 (table), 1993 WL 394848 at * 2 (9th Cir. 1993) (affirming trial court's determination that challenges to two Hispanic-surnamed prospective jurors based on dress and attitude were not pretextual).  Two other circuits have held a prosecutor's perception of

inappropriate dress or grooming to constitute a race-neutral reason to strike a juror.  *See United States v. Jones*, 245 F.3d 990, 993 (8th Cir. 2001); *United States v. Banks*, 10 F.3d 1044, 1049 (4th Cir. 1993).  Various district courts in the Ninth Circuit have also found strikes based on a prospective juror's dress or grooming to be race neutral.  *See Rivera v. Runnels*, 2011 WL 6837720 at *6-7 (C.D.Cal. Oct. 17, 2011) (No. CV 05-3302-AG (OP)) (accepting as race neutral, prosecutor's challenge to a female prospective juror who wore a football jersey); *Farmer v. Hill*, 2011 WL 3807016 at *4 (C.D.Cal. July 18, 2011) (No. CV 10-02872 RGK (RZ)) (holding that a prosecutor may reasonably be concerned about bias when a prospective juror's clothes or hair length suggest an unconventional lifestyle); *Harrison v. Ayers*, 2002 WL 467715 at *12 (N.D.Cal. Mar. 25, 2002) (No. C 00-2134 SI (PR)) (agreeing with state court that prosecutor's peremptory challenge was not pretextual when based on prospective juror's "weird" appearance and "bizarre" clothing combined with apparent low intelligence, perceived hostility, lack of normal relationship to court and other jurors, constant gum chewing, and similarity of her children to the defendant).  Because the state trial court is in the best position to judge a prospective juror's demeanor and dress, a federal district court reviewing the Petitioner's habeas petition should not be quick to second-guess the state court. *Campbell v. Barnes*, 2010 WL 5418874 at *12 (E.D.Cal. Dec. 23, 2010) (No. 2:08-cv-02755-THB). And, in evaluating such peremptory challenges on appeal, the court must consider the challenge in the context of jury selection as a whole. *See Lewis v. Calderon*, 189 Fed.Appx. 658, 660 (9th Cir. 2006) (finding peremptory challenge based on dress pretextual where prosecutor had challenged "extremely high percentage" of African-American prospective jurors for comparably tenuous reasons); *Jackson v. Evans*, 2012 WL 7637663 at *5-6 (C.D.Cal. Mar. 19, 2012) (finding strike based on African-American juror's bright clothing to be pretextual where prosecutor had not challenged white jurors wearing bright clothing).

In concluding that the prosecutor's peremptory challenge of Mr. W. was not pretextual, the state court decision was well within the confines of federal constitutional law.

## V.   Suppression Motion

In ground two, Petitioner claims that his due process rights were denied by the trial court's denial of his suppression motion and by its failure to make adequate findings of fact concerning denial of the motion.  Respondent contends that the claim is too vague and conclusory to permit relief.  The Court agrees.

The trial court granted Petitioner's motion(s) to suppress several categories of evidence, including Petitioner's prior assault conviction, his gang ties, and references to drugs and guns.  The trial court also limited the autopsy photographs to those necessary for the prosecution to prove elements of the charged crimes and required cropping and editing to minimize their prejudicial impact.  Ground two provides no insight into what evidence the trial court did not suppress that Petitioner thinks should have been kept from the jury.

Habeas Rule 2(c) requires the petition to "specify all the grounds for relief available to the petitioner," supported by "the facts supporting each ground."  *Mayle v. Felix*, 545 U.S. 644, 655 (2005).  A court does not err in denying habeas relief based on a conclusory allegation unsupported by specific evidence.  *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995).  In the absence of specific claims supported by facts, a court cannot determine whether the Petitioner's constitutional rights were violated. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Vague, conclusory, patently frivolous or false, or palpably incredible allegations in a petition are subject to summary dismissal. *Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990).

## VI.   Ineffective Assistance of Appellate Counsel

Petitioner contends that ineffective assistance of trial counsel violated his Sixth Amendment rights when (a) trial counsel failed to move for dismissal since retrial was barred; (b) trial counsel failed to present exculpatory evidence; (c) trial counsel failed to investigate prosecution witnesses; (d) trial counsel failed to present witnesses to show the perjury of the prosecution witnesses; and (e) trial counsel failed to move to dismiss charges for insufficient evidence.  He adds that (f) appellate

counsel also provided ineffective assistance when he failed to present issues regarding trial counsel's ineffective assistance on direct appeal.

### A.   **Standard of Review**

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

### B.   **State Opinion**

Petitioner raised his ineffective-assistance-of-counsel claims in his state habeas petition. Because the California Supreme Court summarily denied review, the Court must "look through" the summary denial to the last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). The last reasoned opinion was that of the California Court of Appeal, Fifth Appellate District. In its totality, it reads as follows:

The "Petition for Writ of Habeas Corpus," filed April 16, 2012, is denied. Petitioner raises issues that could have been, but were not raised on appeal, and conclusional ineffective assistance of counsel claims without sufficient factual basis or explanation demonstrating how petitioner was prejudiced. (*In re Clark* (1993) 5 Cal.4th 750.)

*In re Tyler*, No. F064669.

Although the opinion is perfunctory, it accurately restates the holding of the Superior Court's longer opinion. Accordingly, the Court considers it to be the last reasoned opinion.

## C.    **Double Jeopardy**

Arguing that his second trial was barred by the Fifth Amendment's guarantee against double jeopardy, Petitioner contends that trial counsel erred by allowing the second trial to proceed after the declaration of a mistrial in the first trial.

### 1.    **Procedural and Factual Background**

Following the court's consideration of motions in limine, jury selection in Petitioner's first trial began on December 15, 2008. The jury was impaneled on December 17, 2008, and prosecution and defense presented opening arguments. Dionna Williams was called as the first witness. Because Williams then faced criminal charges arising from Darion's death, she declined to testify, asserting her Fifth Amendment right against self-incrimination. Thereafter, the People "presented a petition, pursuant to Penal Code Section 1324, granting her immunity with regard to any testimony that she [gave in the] proceedings." Doc. 40-1 at 11.

At some point on the evening of December 17, 2008, the prosecutor showed Williams photographs of approximately 25 items recovered by police along the highway on which Kenna testified that Watson had discarded items from Petitioner and Williams's home. She identified four items that might have come from her home. Neither the police not the prosecutor had previously questioned Williams regarding the recovered items.

The December 18, 2008, proceedings opened with Williams's testimony. During the first recess, outside the presence of the jury, Petitioner's counsel objected "to counsel [eliciting] any

testimony from Ms. [Williams] concerning identification of any items of evidence seized by the police from the roadside out in the Kern desert, east of Lancaster." Doc. 40-1 at 64.  Declining to keep the jury waiting, the trial judge directed that the items be kept out of sight until a more complete hearing could be held during the lunch break.

At the lunch break, the parties argued about the defense's use of Williams's prior convictions and history of child abuse (propensity for violence) for impeachment purposes before proceeding to the argument concerning items recovered from the desert roadside.  The prosecutor disclosed that he had first shown Williams photographs of the recovered items the night before and that she had tentatively identified four items that she thought might have come from her house.  That morning, a police officer had shown Williams the four items in question, and she identified a towel and a sheet as having come from her home.

The prosecutor stated that he did not know whether the items had been available to be shown to Williams when police interviewed her following their discovery, only that he knew that they had not, in fact, been shown to her.  Transcripts of the interviews documented that Williams had not been asked whether any of the items had come from her house.   The photographs had been provided to the defense in discovery.

Petitioner's counsel objected, stating that he was "not prepared to meet the evidence." Doc. 40-1 at 121.  If the trial court was inclined to admit the evidence, defense counsel would request a continuance for further preparation.  Among other things, counsel intended to request testing of stains on the towel and sheets to identify if they were blood and if so, whose blood it was.  The prosecutor conceded that the reddish-brown stains could be blood and stated that to the best of his knowledge, no testing had been conducted to identify the stains.  Defense counsel then argued:

> [I]n preparation for the trial, I was fairly certain in saying that they were not going to be able to link up what was on the side with the case[,] therefore[,] that would kind of undermine Kenna's credibility.  Tend to undermine Dionna's credibility. That is my belief in the state of the case.

In fact, I referred to that in my opening statement.  In fact, I would ask counsel if he wouldn't mind telling me whether he got this information after I made my opening statement or before that.

Doc. 40-1 at 123.

The prosecutor replied:

It was after we had finished with the jury and right before I left last night.  So it would have been after opening statements.  I appreciate the inquiries whether or not receiving it was after the opening statement.

I did not have any chance to talk to her before that because she has, since being charged, had an attorney, and I could not ask her about it when it's realized later that this is something that should be looked into.

Doc. 40-1 at 124.

Defense counsel explained that, having been certain that the recovered items had no connection to the case and had no evidentiary value except as exculpatory evidence, he had not seen a need to request testing of the items.  The judge agreed that the items had not been expected to be admitted in the case.  Recognizing the seriousness of the violation of Petitioner's rights, the judge asked counsel for their thoughts, suggesting alternatives such as excluding the evidence or mistrying the case, emphasizing the importance of getting to the truth in a criminal trial, and expressing concern that jeopardy had already attached.  The prosecutor restated that neither Williams nor Kenna were ever asked about the items, even though in hindsight it appeared that someone should have questioned them, but he expressed reluctance simply to represent to the jury that nothing found along the highway could have come from Williams's house.

Defense counsel requested an opportunity to confer with Petitioner, then stated:

Your Honor, at this point I'm going to need to continue this one way or the other. Here counsel can say I'll withdraw using the evidence.  Nonetheless, I think we have a right, now knowing that they are claiming, that that is connected to Dionna's residence, to go out and independently check that.

If we can prove there is no connection, tends to undermine.  And then I can go into my full cross-examination of her, which my intention was to confront her

20

with all this stuff in the desert, and if there is no stuff in connection with her
house.  When I came onto this trial I was intending to go full board on that stuff.

The fact that counsel says I'll take it off the table, in other words, I'm precluded
now from asking the witness about the failure to connect anything from the
roadside that was at the apartment.

Doc. 40-1 at 124.

The court observed the importance of ensuring that Petitioner received a fair trial and was
"given every opportunity to present every defense that is reasonably available to him."  Doc. 40-1 at
132.  The prosecution did not oppose the motion but questioned the need to hold the jury over for the
many months it would likely take to secure laboratory analysis of the sheet and towel.  Defense
counsel agreed that in light of the limited labs available in California, analyzing the sheet and towel
was likely to take six months.

Defense counsel moved for a mistrial "based upon his need to analyze additional evidence."
Clerks' Transcript at 320.

MR. EYHERABIDE:  I'll concede it's our motion.  We're asking for the relief the
Court and counsel are ready to go forward.  But for my motion I don't think there
could be a claim of double jeopardy under those circumstances.

THE COURT:  Mr. Tyler, you agree you want the matter continued so this
evidence can be analyzed?  And you agree that jeopardy is not attached?

THE DEFENDANT:  Yes, sir.

Doc. 40-1 at 134.

The trial court declared a mistrial as to all counts based on the need to analyze the sheet and
towel recovered from the roadside.

## 2.   Court of Appeals Decision

The last reasoned decision on Petitioner's double jeopardy claim is that set forth in the Kern
County Superior Court's denial of the petition for writ of habeas corpus.  Citing *Oregon v. Kennedy*,
456 U.S. 667 (1982), the Superior Court found no double jeopardy violation since the mistrial was

1   not mandated by prosecutorial overreaching or misconduct, but by the newly discovered evidence

2   that defense counsel sought to examine fully.

3                      **3.      Double Jeopardy**

4          The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution provides that

5   no person shall twice "be put in jeopardy of life or limb" for the same offense.  "The Double

6   Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal.  It

7   protects against a second prosecution for the same offense after conviction. And it protects against

8   multiple punishments for the same offense.'"  *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting

9   *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

10

11         "The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from

12  repeated prosecutions for the same offense."  *Kennedy*, 456 U.S. at 671.  It does not guarantee that

13  the State will prosecute the defendant in a single proceeding, however.  *Id.* at 671-72.  "This right is

14  not absolute, however, and must at times be subordinated to society's interest in just determinations

15  of guilt and innocence."  *Greyson v. Kellam*, 937 F.2d 1409, 1413 (9th Cir. 1991). "If the law were

16  otherwise, 'the purpose of the law to protect society from those guilty of crimes frequently would be

17  frustrated by denying courts power to put the defendant to trial again.'"  *Kennedy*, 456 U.S. at 671

18  (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).  "A defendant does not necessarily go free if

19  the trial does not end in a final judgment, *e.g.*, when a mistrial is declared."  *United States v. Goland*,

20  897 F.2d 405, 409 (9th Cir. 1990).

21

22         The Supreme Court has established two standards to determine whether the double jeopardy

23  clause bars retrial after the declaration of a mistrial.  *United States v. Mondragon*, 741 F.3d 1010,

24  1013 (9th Cir. 2013).  "Where the trial is terminated over the objection of the defendant, the classical

25  test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard."  *Id.*

26  (quoting *Kennedy*, 456 U.S. at 672).  If the manifest necessity standard applies, the double jeopardy

27

28

clause bars retrial based on the defendant's interest in having his case decided by the first jury selected. *Mondragon*, 741 F.3d at 2023.

Manifest necessity does not apply when a trial court declares a mistrial in response to a defendant's motion or at his request, as is the case here. *Id.* "[W]hen a defendant seeks or consents to mistrial, we presume that the defendant 'gives up his or her right to a verdict by that jury.'" *Mondragon,* 741 F.3d at 1013 (quoting *United States v. Lewis*, 368 F.3d 1102, 1108 (9th Cir. 2004)). The double jeopardy clause does not bar reprosecution even if the defendant moved for a mistrial because of prosecutorial error or misconduct. *United States v. Jorn*, 400 U.S. 470, 485 (1971); *United States v. Lopez-Avila*, 678 F.3d 955, 962 (9th Cir. 2012); *United States v. Perlaza*, 439 F.3d 1149, 1173 (9th Cir. 2006).   The sole, and very narrow, exception is "those cases in which the conduct giving rise to the successful motion for mistrial was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679.  "In practice, the *Kennedy* standard is rarely met." *Lopez-Avila*, 678 F.3d at 962.

"When a defendant moves for or consents to a mistrial, the relevant inquiry is not simply whether the misconduct conceivable could result in a mistrial  . . .  the relevant inquiry is whether the impropriety was an attempt to prevent the empaneled jury from reaching its verdict." *Mondragon*, 741 F.3d at 1014.  In other words, "the Double Jeopardy Clause 'prevents prosecutors from sinking a case they knew was doomed to end in an acquittal in the hope of having better luck before a second jury.'"  *Perlaza*, 439 F.3d at 1173 (quoting *Lewis*, 368 F.3d at 1108).  "Even when the government's actions remove[] any meaningful choice for defendants between pushing on with the trial or seeking mistrial," defendants bear the heavy burden of proving that the prosecutor "intended" the results. *United States v. Lun*, 944 F.2d 642, 646 (9th Cir. 1991).

Nothing in the record suggests that the prosecutor sought to derail Petitioner's first trial.  In fact, defense counsel moved for the mistrial before the completion of the first witness's testimony.  Prosecutor, defense counsel, and trial judge all agreed that until Williams reviewed the photographs

after the first day of trial, everyone had assumed that none of the items recovered from the desert roadside could be tied to Darion's death or to Williams's home.  The prosecutor candidly acknowledged that the government had erred in failing to ask Williams or Young about the recovered items earlier.

Instead, defense counsel vehemently argued the necessity of continuing the trial both because Williams's identification of two items destroyed his contention in the opening statement that nothing from the desert could be linked Williams's home and because testing of the apparent blood stains on the sheet and towels offered the possibility of linking another individual to Darion's murder.  (The defense sought to blame the murder on Williams.)

As set forth above, the state court concluded that defense counsel requested the mistrial to permit his complete evaluation of the newly discovered evidence that certain of the items recovered from the desert might have come from Williams's home.  Because the mistrial was not mandated by prosecutorial overreaching or misconduct, the court found no double jeopardy violation.  The state court's decision was neither contrary to, nor an unreasonable application of federal Supreme Court precedent.

## C.   **Exculpatory Evidence**

As his fourth ground for habeas relief, Petitioner contends that because his trial counsel failed to present exculpatory evidence, counsel's assistance was ineffective.  Respondent replies that the Court of Appeal appropriately denied this claim as vague for failure to show a factual basis or prejudice.  The Court agrees.

In his habeas petition, Petitioner stated, "After Prosecution's attempt to present the evidence that caused a defense sought mistrial, the evidence became clearly exculpatory in nature to negate Petitioner's guilt.  Trial counsel made no presentation of the evidence where it would defend against prosecution's case.  The counsel's failure prejudiced Petitioner."  Doc. 15 at 5.  In his traverse,

///

24

Petitioner contends for the first time that counsel should have used the shorts that police recovered along the highway in Petitioner's favor.

This Court agrees with the California Court of Appeals that Petitioner's ineffective-assistance-of-counsel claims were conclusory, had no factual basis, and failed to explain the source or nature of any resulting prejudice.  Simply put, from his habeas petition to the California Superior Court to the first amended petition in this court, Petitioner's articulation of his claim failed to even hint at the nature of the exculpatory evidence to which he was referring. Allegations in a petition that are vague, conclusory, patently frivolous or false, or palpably incredible are subject to summary dismissal.  *Hendricks*, 908 F.2d at 491.

In addition, raising substantively new issues or claims in a traverse is improper (*Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994)): Petitioner's first reference to the blue shorts in his traverse is tantamount to presenting a new issue or claim.

In any event, the blue shorts that police recovered from the desert highway were not exculpatory evidence.  Police searched the highway for evidence following witness Young's testimony that co-defendant Watson removed various items from the home that Petitioner shared with Williams.  Because nothing recovered from the highway, including the blue shorts, could be tied to Petitioner or to the killing of Darion, the recovered evidence could neither tie Petitioner to Darion's murder nor absolve him of it.

The state court reasonably rejected the claim that trial counsel rendered ineffective assistance by failing to introduce exculpatory evidence.

### D. Failure to Investigate Prosecution Witnesses

In ground five, Petitioner contends that because trial counsel failed to investigate the prosecution's witnesses to determine the evidentiary weight of their testimony before trial, counsel's assistance was ineffective.  Respondent again replies that the Court of Appeal appropriately denied this vague claim as for failure to show a factual basis or prejudice.  Petitioner contends for the first

///

time in his traverse that the witness that trial counsel failed to investigate adequately was Kenna Young.

The same analysis applies here as applied to ground four.  In light of Petitioner's vague and conclusory claim and supporting allegations, ground five is subject to summary dismissal.  *Hendricks*, 908 F.2d at 491.

Also, as previously stated, raising an issue for the first time in a traverse is improper. *Cacoperdo*, 37 F.3d at 507.  Even if focusing the claim on Young had been timely, it is contradicted by the facts of the record.  The Clerk's transcript documents trial counsel's request for Young's criminal records: none were forthcoming. Trial counsel investigated Young's school records and aggressively used evidence of her behavioral infractions and a teacher's testimony regarding her reputation for telling untruths to impeach her testimony.

The Court of Appeals reasonably rejected ground five as vague and conclusory.

**E.**     **Failure to Present Impeaching Witnesses**

In ground six, Petitioner contends that trial counsel's assistance was ineffective because he failed to present witnesses whose testimony could show that prosecution witnesses perjured themselves.  Up to and including his first amended petition, Petitioner did not specifically identify the "witnesses" that he contended perjured themselves.  At its simplest level, the Court can dispose of this claim as it did claims 4 and 5, by finding that the California courts appropriately refused to address this vague and conclusory claim.  To address the claim fully, however, the Court must comment on several related matters.

For the first time in his traverse, Petitioner explicitly names Kenna Young as the only witness who allegedly gave perjured testimony.  Again, the presentation of this supplemental information in the traverse is too late, and too little, to save the vague and conclusory grounds of the habeas petition.  *Cacoperdo*, 37 F.3d at 507.

///

26

Identifying the witness as Young presents a curious factual oversight.  Petitioner claims that trial counsel should have presented the testimony of the social worker and the police officer who accompanied her to Watson's home to take custody of Kahloni, Kenneth, and Alaia.  In fact, the defense did call social worker Michelle Tapia (see Reporter's Transcript, vol. 10 at 1232).  Defense counsel questioned Tapia about her interaction with Young, the witness whom Petitioner accuses of perjury, and about aspects of Young's testimony such as the presence of a gun on the kitchen counter.  *See* Reporter's Transcript, vol. 10 at 1239-43.  The examination tended to undermine the portion of Young's testimony about her time at Watson's home on August 11, 2006, the day on which Tiffinay and Dionna took Darion from Watson's home to seek medical care.

Further, in making his argument, Petitioner confuses the concepts of perjury and impeachment.  A witness testifying under oath commits perjury if she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Materiality is an essential element.  *United States v. Taylor*, 693 F.Supp. 828, 833 (N.D.Cal. 1988). Neither Young's state of mind while in Watson's home nor her fearfulness (or lack thereof) when Tapia took Kahloni, Kenneth, and Alaia into state custody are in any way material to Petitioner's guilt or innocence to the murder and assault charges. Instead, Petitioner's concern is the impeachment of Young's incriminating testimony that she and Williams arrived home after Petitioner had beaten Darion.

As discussed above, trial counsel reviewed Young's criminal background and school record and called a former teacher to testify regarding Young's behavior and reputation for untruthfulness. In his cross-examination, he aggressively and repeatedly questioned Young about her failure to flee Watson's home or request help from the social worker or her police escort.  Trial counsel's questioning of Tapia further impeached Young's testimony by introducing Tapia's impression of

///

27

Young's state of mind and contradicting some of Young's testimony regarding conditions in Watkin's home.

Ground six was not only vague and conclusory, it was contrary to the facts.  The state court reasonably refused to entertain it.

### F.   <u>Sufficiency of Evidence</u>

In claim seven, Petitioner contends that trial counsel's assistance was ineffective based on counsel's failure to move to dismiss the case prior to trial or to move for a mistrial at the close of the prosecution's case.  The Court agrees with the state court's assessment of the evidence, which led it to reject this claim.  As the Superior Court put it, "Given the paucity of favorable evidence, such a motion would be futile.  If evidence is sufficient as here to sustain a conviction, the motion for acquittal is properly denied by the court."  *In re Tyler*, No. HC012839A (Kern County Superior Ct. Feb. 15, 2012).

The trial court instructed the jury that to prove Petitioner guilty of the second-degree murder of Darion Wheat (count one), the State was required to prove that (1) Petitioner committed an act that caused Darion's death, and (2) he committed the act with malice aforethought.  Although malice aforethought includes express malice and implied malice, the State only alleged implied malice in this case.  A person acts with implied malice if (1) he intentionally committed an act; (2) the consequences of the act were dangerous to human life; (3) at the time he acted, the person knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life.

To prove Petitioner guilty of killing a child under the age of eight by assaulting the child with force likely to produce great bodily injury (count two), the State was required to prove that (1) Petitioner had care or custody of a child under the age of eight; (2) Petitioner did an act that by its nature would directly and probably result in the application of force to the child; (3) Petitioner did the act willfully; (4) the force used was likely to produce great bodily injury to the child; (5) when

Petitioner acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child; (6) when Petitioner acted, he had the present ability to apply force likely to produce great bodily injury to the child; and (7) Petitioner's act caused the child's death.  As set forth in the factual background statement above, the State presented sufficient evidence from which the jury could conclude, if it found the evidence credible, that Petitioner was guilty of the two crimes charged.

Although the defense hammered Williams' and Young's credibility, it presented no evidence tending to show that Williams or anyone else other than Petitioner brutally beat Darion Wheat on August 10, 2006.  Nothing in the record suggests that such evidence existed but defense counsel failed to present it.  The state court reasonably rejected Petitioner's attempt to characterize his conviction as resulting from counsel's performance rather than reflecting the overwhelming evidence against him.

### G.      Ineffective Assistance of Appellate Counsel

Finally, in ground eight, Petitioner contends that his appellate counsel provided ineffective assistance on direct appeal by failing to advance a claim of ineffective assistance of trial counsel.

In general, California courts discourage the inclusion of ineffective assistance of counsel claims in direct appeals of criminal convictions.  When "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim on appeal must be rejected."  *People v. Wilson*, 3 Cal.4th 926, 936 (1992) (quoting *People v. Pope*, 23 Cal.3d 412, 426 (1979)).  "To promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representation should file a verified petition for writ of habeas corpus."  *Wilson*, 3 Cal.4th at 936 (1992) (quoting *Pope*, 23 Cal.3d at 426).  In view of the lack of merit of Petitioner's claims that his trial counsel provided ineffective assistance, ground eight is also meritless.

**H.**       **Conclusion**

The state courts reasonably rejected Petitioner's claims of ineffective assistance of counsel.

**V.**   **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district

court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*,

537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of

appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
> district judge, the final order shall be subject to review, on appeal, by the court of
> appeals for the circuit in which the proceeding is held.
>
> (b)  There shall be no right of appeal from a final order in a proceeding to test the
> validity of a warrant to remove to another district or place for commitment or
> trial a person charged with a criminal offense against the United States, or to test
> the validity of such person's detention pending removal proceedings.
>
> (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an
>          appeal may not be taken to the court of appeals from—
>
>> (A)  the final order in a habeas corpus proceeding in which the detention
>>  complained of arises out of process issued by a State court; or
>>
>> (B)  the final order in a proceeding under section 2255.
>
>
>> (2)  A certificate of appealability may issue under paragraph (1) only if the
>> applicant has made a substantial showing of the denial of a constitutional
>> right.
>>
>> (3)  The certificate of appealability under paragraph (1) shall indicate which
>> specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability

when the prisoner shows "that reasonable jurists could debate whether . . . the petition should have

been resolved in a different manner or that the issues presented were adequate to deserve

encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation

omitted).  Although the petitioner is not required to prove the merits of his case, he must

demonstrate "something more than the absence of frivolity or the existence of mere good faith on his

. . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's

determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

deserving of encouragement to proceed further.  Petitioner has not made the required substantial

showing of the denial of a constitutional right.  Accordingly, the Court declines to issue a certificate

of appealability.

**VI.**      **Conclusion**

The Court hereby DENIES the petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The Court declines to issue a certificate of appealability.  The Clerk of Court is directed to

enter judgment for the Respondent.


IT IS SO ORDERED.

Dated:   **October 27, 2015**                          **/s/ Sheila K. Oberto**
                                          UNITED STATES MAGISTRATE JUDGE